# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# HARRISONBURG DIVISION

| | |
|---|---|
| RUSSELL KINNARD HENRY, JR., ) | |
| ) | |
| ) | |
| Petitioner, ) | Civil Action No.: 5:11cr0026-1 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | By: Hon. Robert S. Ballou |
| ) | United States Magistrate Judge |
| ) | |
| Respondent. ) | |
| ) | |

## REPORT AND RECOMMENDATION

Petitioner, Russell Kinnard Henry, Jr., ("Henry"), filed a motion to Vacate, Set Aside, or Correct his sentence pursuant to 18 U.S.C. § 2255 contending that he received ineffective assistance of counsel in connection with his guilty plea and sentence because (1) counsel failed to convey to him a plea offer that the government sent by e-mail, but which counsel never received and (2) counsel failed to communicate adequately with him both pre-indictment and post-indictment. I conducted an evidentiary hearing upon the district court referring Henry's motion pursuant to 28 U.S.C. § 636(b)(1)(B). I have considered the evidence presented, the legal arguments of counsel and the applicable law. I conclude that Henry has failed to establish that he received constitutionally ineffective assistance of his counsel, and therefore **RECOMMEND DENYING** Henry's motion and **GRANTING** the Government's motion to dismiss.

### I. Procedural History

On August 4, 2011, a federal grand jury sitting in Harrisonburg returned a twenty-four count indictment against Henry charging him with bank fraud, theft by a bank employee, and

making false statements to a bank in violation of 18 U.S.C. §§ 1344, 656, and 1014. Shortly before the scheduled trial date, Henry entered into a written plea agreement in which he agreed to plead guilty to three counts of the indictment. The court conducted an extensive plea colloquy and accepted Henry's plea, finding that he knowingly and voluntarily entered into his plea agreement and made his guilty plea. The court sentenced Henry to 57 months incarceration on each count to serve concurrently. Additionally, the court ordered Henry to pay restitution in the amount of $532,044.39, and dismissed the remaining counts of the indictment.

Henry filed the present motion to vacate his sentence under 18 U.S.C. § 2255 arguing that trial counsel failed to inform him of a written plea offer which the government made before it indicted him and that he accepted a less favorable plea deal right before trial. Henry also asserts that counsel infrequently communicated with him and that he did not have an adequate opportunity to review the plea agreement he entered into before accepting its terms. The district judge found that disputed facts existed regarding Henry's claims and referred the matter to me to conduct such hearings as necessary and to submit findings of fact and recommendations for disposition. The matter is now ripe for disposition.

II.     Facts

The investigation into Henry's misdeeds extends back to 2008 when Henry was employed as a bank officer in Harrisonburg, Virginia. Special agents of the FBI met with Henry in 2008 and informed him that he was under investigation for bank fraud. Henry promptly sought legal advice from Roy P. Wolfe, Jr., Esq., a local attorney with whom Henry had been acquainted for several years and who worked near Henry. Mr. Wolfe had primarily a civil law practice and recommended that Henry contact A. Gene Hart, Esq., who has significant experience in federal criminal law, to represent him in this criminal investigation.

2

Mr. Wolfe remained involved as Henry's legal counselor during this investigation period and after Mr. Hart undertook the primary representation of Henry. Mr. Wolfe did not require Henry to enter into a formal retainer agreement, and in fact, it appears that Mr. Wolfe never charged a fee for his legal services. Throughout the pre-indictment investigation, Mr. Hart had the primary contact with the government and communicated with Henry though Mr. Wolfe. Nevertheless, there is no dispute that Henry had retained Mr. Hart to represent him during the government's investigation.

Mr. Hart met with federal prosecutors and agents in Charlottesville in June 2008 to discuss the ongoing criminal investigation. Mr. Hart wrote an extensive letter to Mr. Wolfe following this meeting and provided a "detailed summary outline of the case as the government sees it" as well as his evaluation of the government's evidence. Dkt. No. 99-5. Mr. Hart painted a bleak assessment of Henry's position, stating that "this is quite a mess for Mr. Henry" and that the government's investigation "did not appear to be any sort of bluff." He observed that he and Mr. Wolfe "may need to have a very difficult conversation with Mr. Henry," and that they may "need to act early to limit Mr. Henry's exposure." Mr. Hart also gave the dire prediction in the letter that Henry should avoid trial if at all possible. Mr. Hart attached to his letter a draft pre-indictment plea agreement from the government, which, if accepted would have a sentencing range of 51 – 63 months of incarceration (the "First Plea Agreement"). (Dkt. 99-1). Mr. Hart stated that the plea offer, "as bad as it may seem," would be more favorable to Henry as compared to any subsequent offer the government would make.

Messrs. Wolfe and Hart met with Henry together to discuss the government's evidence and investigation and the proposed plea agreement. Henry denies that this meeting occurred, but Mr. Hart sent an e-mail to the Assistant United States Attorney then handling the investigation

on July 14, 2008 stating that "[a]fter careful consideration, Mr. Henry does not desire to enter into any form of felony preindictment plea agreement." Dkt. 99-4. Mr. Hart testified at the evidentiary hearing that he determined Henry lacked interest in a plea before the government brought charges, and that Henry simply wanted to delay the case as much as possible.

The government did not aggressively pursue the criminal investigation against Henry and there were long periods of inactivity during which it was not clear the investigation was moving forward. In the interim, Henry claims that he periodically asked Mr. Wolfe about the status the criminal investigation, but received only minimal communication.

Mr. Hart states that during this time period, he would receive some form of contact from the government every three to six months. The government would indicate that they were still investigating Henry and inquire as to whether Henry had any interest in a pre-indictment plea agreement. Mr. Hart reports that he would then contact Mr. Wolfe, who in turn would contact Henry. Mr. Wolfe would then relay Henry's desires to Mr. Hart, who would then communicate with the government. Both Mr. Wolfe and Mr. Hart testified that Henry never indicated any interest in moving forward with a pre-indictment plea deal.

In December 2010, Assistant United States Attorney Joseph Mott sent a second proposed pre-indictment plea agreement to Mr. Hart by e-mail (the "Second Plea Agreement"). Mott sent the Second Plea Agreement to a dormant e-mail address account Mr. Hart had used to set up a PACER account, and thus, Mr. Hart never received either the e-mail or the proposed agreement. In fact, Mr. Hart saw the Second Plea Agreement and the transmittal e-mail from Mr. Mott for the first time the day before the evidentiary hearing as he investigated with Henry's current counsel why he never received these documents. There is no evidence that the government followed up with Mr. Hart regarding the Second Plea Agreement or that it attempted to

communicate the proposal by any means other than sending it to Mr. Hart's defunct e-mail address.[1]

Throughout the pre-indictment investigation and the post-indictment period leading up to trial, Henry steadfastly maintained that his wrongful conduct was not criminal, but should be resolved through civil legal action. See Dkt. 99-4. As such, Henry remained ready and willing to fight the charges when he was indicted on August 4, 2011. Henry appeared for his initial appearance on August 22, 2011 with both Mssrs. Wolfe and Hart present. Henry, who according to Mr. Hart could not afford to retain both Mr. Hart and Mr. Wolfe, retained Mr. Hart to defend him against the criminal charges. Mr. Wolfe did not have any further direct involvement with the matter once Mr. Hart entered into a formal retainer agreement with Henry.[2]

Henry states that, once he paid Mr. Hart the retainer after his initial appearance, he did not speak with Mr. Hart about his case again until November 2011, three or four days before the case was set to go to trial. Henry claims, because he had heard very little up until this point, he believed the purpose of meeting was to discuss continuing the trial. Henry further claims that Mr. Hart had not reviewed any expected defenses or other trial preparation with him prior to the November 2011 meeting. Henry asserts he never heard anything from Mr. Hart prior to the November 2011 meeting about plea negotiations with the government and that Mr. Hart had never previously explained how a guilty plea worked. Henry states that he became nervous about facing a twenty-four count indictment and asked Mr. Hart when he met with him in November 2011 what would happen if he entered a guilty plea.

---

[1] Mr. Hart stated that, had he seen the December 2010 offer, he would have advised Henry to strongly consider it.

[2] Henry reports having some conversation with Mr. Wolfe during this time period, but that, post-indictment, these exchanges were casual in nature—more of an exchange of pleasantries between people who worked in the same building.

5

Mr. Hart testified that Henry maintained his innocence up until the time he decided to enter a guilty plea. Mr. Hart states that he did in fact meet with Henry during this time period, although these meetings were not extensive. In Mr. Hart's words, he met with Henry when he had useful information to provide to him. Mr. Hart states that he never received any formal plea offer from the government between Henry's indictment on August 4, 2011 and the November 2011 meeting because there was an understanding that such an offer would not be well received. Mr. Hart further states that he did not discuss the plea bargaining process with Henry because Henry had no desire to enter a guilty plea.[3]

Henry does not currently deny his guilt. He claims that Mr. Hart never explained the potential benefit of taking an earlier plea in terms of the point reductions available under the sentencing guidelines for early acceptance of responsibility. Indeed, Henry claims that he did not have an understanding of the federal criminal process and the way plea agreements worked until his meeting with Mr. Hart shortly before trial. Henry further claims that he would have accepted a plea offer had he known of one in 2010, because he knew that he was guilty and he was worried about the period of incarceration the government would seek.

Ultimately, Henry entered a guilty plea to three counts of the indictment (the "Final Plea Agreement"). The Final Plea Agreement and the Second Plea Agreement differ in several material respects. The Second Plea Agreement had a lower sentencing guideline range of 33 – 41 months and an agreement that the government would recommend a sentence at the lower end of the sentencing range. Further the government agreed that Henry would get a two point offense level reduction for acceptance of responsibility and the government would agree to move for an additional point reduction. The agreement also provided for a downward departure for

---

[3] Mr. Hart also states that it has always been his practice to share any formal plea offer from the government with his clients, even before the Supreme Court decision in <u>Missouri v. Frye</u>, 132 S. Ct. 1399 (2012).

6

providing substantial assistance. Finally, the Second Plea Agreement stipulated the total loss at $786,694.89. The Final Plea agreement differed in that it did not provide that the government would move for a third point reduction because of the late agreement to plead guilty, that there would be no further reduction for providing substantial assistance, the government would not recommend a sentence at the low end of the guideline range and there was no stipulation of loss amount. Ultimately the pre-sentence report found a loss of greater than $1,000,000 and a sentencing range of 46 – 57 months.

Henry was sentenced to 57 months (4 ¾ years). Henry asserts that Mr. Hart, upon exiting the courtroom at Henry's sentencing, made a comment to the effect of "I should have taken the offer of three to three and a half offered by the prosecution earlier." Henry claims that he did not have any reason to complain about Mr. Hart's representation until learning that the government had previously offered three to three and half years. In contrast, Mr. Hart states that upon exiting the courtroom, he stated his belief that the judge had imposed a high sentence and expressed regret that an error in the pre-sentencing report, prepared by a probation officer employed by the court, had been caught and corrected. The original, pre-sentencing report had—erroneously— suggested a guidelines range of three to three and a half years.

## ANALYSIS

To establish a claim for ineffective assistance, Henry must show both deficient performance by his counsel and prejudice caused by counsel's ineffective representation. See Strickland v. Washington, 466 U.S. 668, 669 (1984). Courts are highly deferential in the evaluation of counsel's performance, and apply a strong presumption that counsel's representation of a defendant was within the "wide range" of reasonable professional assistance. Id.; see also Fields v. Att'y General of Maryland, 956 F. 2d 1290, 1297–99 (4th Cir. 1992);

7

Hutchins v. Garrison, 724 F.2d 1425, 1430–31 (4th Cir. 1983); Marzullo v. Maryland, 561 F.2d 540 (4th Cir. 1977). Henry may overcome this presumption by showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. Courts evaluate counsel's representation by an objective standard of reasonableness of whether counsel's performance amounted to "incompetence under 'prevailing professional norms.'" Premo v. Moore, 131 S.Ct. 733, 740 (2011)(quoting Strickland, 466 U.S. at 690). The prejudice prong requires that Henry show "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' i.e., that he would have been found not guilty." Burr v. Lassiter, 513 Fed. Appx. 327, 340 (4th Cir. 2013)(citing Strickland, 466 U.S. at 694). The likelihood of a different outcome must be "substantial," and not merely "conceivable." Harrington v. Richeter, 131 S.Ct. 770, 787 (2011).

The Sixth Amendment right to counsel extends to plea bargaining, and thus, criminal defendants are entitled to effective counsel during that process as well. Missouri v. Frye, 132 S.Ct. 1399, 1405 (2012); Lafler v. Cooper, 132 S.Ct. 1376, 1384 (2012). In the plea context, the prejudice inquiry focuses on whether the allegedly ineffective performance affected the outcome of the plea process. Merzbacher v. Shearin, 2013 WL 285706, at *6 (4th Cir. 2013). "To show prejudice from ineffective assistance of counsel in a case involving a plea offer, petitioners must demonstrate a reasonable probability that (1) 'they would have accepted the earlier plea offer had they been afforded effective assistance of counsel,' and (2) 'the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law.'" Id. at *8 (citing Frye, 132 S.Ct. at 1409; Lafler, 132 S.Ct. at 1385).

8

Plea bargaining is an essential element of the criminal process, see Santobello v. New York, 404 U.S. 257, 260 (1971), however, a criminal defendant does not have a constitutional right to a plea bargain. Field v. Maryland, 956 F.2d 1290, 1296 n.19 (4th Cir. 1992). Whether and how to initiate a plea bargaining discussion is a strategic decision, and the attorney is under no duty to seek a plea bargain with the government where he reasonably believes the government will reject negotiations. Griffin v. United States, 2011 WL 1743835, at *3 (E.D.N.C. 2011). Here, to show prejudice, Henry must establish not only that he received constitutionally insufficient advice, but also that the outcome of the plea process would have been different with competent advice. Lafler, 132 S.Ct. at 1385.

Henry conflates his two arguments that Mr. Hart provided ineffective assistance by failing to convey the Second Plea Agreement and not communicating with him pre- and post-indictment. The evidence is clear that Mr. Hart did not receive the Second Plea Agreement. The government sent this plea offer to Mr. Hart at a dormant e-mail address originally used to establish a PACER account. The government never followed up with Mr. Hart as to whether he received the plea offer or how Henry may have responded to this proposed plea deal. Counsel could not have been ineffective for not sending to Henry something he never had. Therefore, I find the claim that Mr. Hart failed to convey the Second Plea Agreement to have no merit.[4]

---

[4] Henry cannot rely upon Rule 1.2 of the Virginia Rules of Professional Conduct to establish that Mr. Hart rendered ineffective assistance by not conveying an offer of settlement. "Under the *Strickland* standard, breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel. When examining attorney conduct, a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct." Nix v. Whiteside, 475 U.S. 157, 165 (1986). Prevailing norms of practice such as standards published by the ABA may be guides to determining what is reasonable, but these are only guides. Strickland 468 U.S. at 688. The Nix court reserved for another decision whether recognized ethical canons or professional codes of conduct may be given weight in determining whether an attorney has rendered constitutionally ineffective assistance. Here, there is no need to reach that question as I find that neither of the Rules of Professional Conduct Henry relies upon provide a foundation to establish that Mr. Hart was ineffective in his representation of Henry.

9

The more nuanced argument from Henry is that had counsel communicated more with him both pre-indictment and post-indictment, Henry would have conveyed his desire to avoid trial and plead guilty. Counsel would have then engaged in plea negotiations much earlier than November 2011, and, Henry argues counsel would have learned of the Second Plea Agreement, which Henry would have accepted.

Henry asserts that better communication pre-indictment would have resulted in Mr. Hart learning about the December 2010 plea offer and that he would have accepted a plea deal at a sentencing range of 33 – 41 months. Henry likewise argues that Mr. Hart failed to adequately communicate with him post-indictment about the status of the case and as a result lost at least one point on his sentence calculation for acceptance of responsibility. The record simply does not support these contentions. Mr. Hart informed Henry early in the process of the strength of the government's evidence, and encouraged Henry to act early in order to limit Henry's exposure. The evidence also clearly shows that Henry did not intend to accept guilt and that Mr. Hart was preparing to try the case. There is no evidence that because Mr. Hart did not speak with Henry about the case, a defense was lost, witnesses were not found, or that Mr. Hart was not able to defend the case fully and completely. Beyond Henry's own testimony, nothing in the record supports his argument that more frequent communication with Mr. Hart would have led to discovery of the Second Plea Agreement. Thus, I find that Henry has failed to make the required showing that Mr. Hart's representation was constitutionally deficient with regard to communication in the attorney-client relationship.

Henry also fails to carry the significant burden of showing prejudice in the plea process. Henry had rejected the First Plea Agreement, and counsel never received the Second Plea Agreement. Typically, the remedy for failing to provide a defendant with a proposed plea

10

agreement is to extend the plea offer again to the defendant. See Lafler, 132 S.Ct. at 1391.

Here, Henry would not be entitled to have the Second Plea Agreement offered to him again. Mr. Hart never received the agreement and thus was not ineffective for failing to forward it to Henry. Instead, what Henry must show is that had Mr. Hart spoken with Henry more frequently, the plea process would have yielded something different than what ultimately the government offered in November 2011. Otherwise, no prejudice to Henry would have occurred. Henry has offered no evidence to support this conclusion. In fact, the record suggests a conclusion to the contrary.

Henry steadfastly maintained that his misconduct was a civil matter and was not criminal in nature. He had rejected one plea agreement in 2008, and Mr. Hart had no duty to pursue plea negotiations which he knew the government (or his client) would not accept. More importantly, Henry has offered no evidence to contradict Mr. Hart's testimony that Henry intended to contest the charges throughout the post-indictment period and that he never had any intention of pleading guilty to the charges. The government did not make any plea offers and Mr. Hart sought none, further supporting the testimony of Mr. Hart that such discussions would have been futile because of the divergent views of the case between the government and Henry.

Certainly a more robust communication history between Mr. Hart and Henry would have been preferable in advance of a criminal trial of this magnitude. There simply is no evidence, however, as to what the plea negotiation process would have yielded at any point from December 2010 to the indictment in August 2011, or post-indictment up to the time Henry ultimately elected to plead guilty. Henry, as the petitioner, had the burden of showing that this scenario would have yielded a different result than the plea agreement in November 2011.

Mr. Hart made clear to Henry in 2008 that the government's evidence was strong and that he should consider an early acceptance of responsibility. Henry elected not to follow this advice,

11

but he also knew at that time that the government plea offers would not likely improve. In December 2010, the government did make an offer that was considerably better than the First Plea Agreement. It is pure speculation, however, as to what would have been offered by the government after December 2010, and that simply does not carry the burden of proof on the prejudice prong of the Strickland requirement.

## CONCLUSION

For the foregoing reasons, I find that Henry has failed to carry his burden of proof that his counsel was ineffective in any manner which caused him prejudice, and thus, I recommend that the court grant the government's motion to dismiss and dismiss this action.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter: April 28, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge